_____

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____
                                     :
WALTER BENNETT, GREGORY ROYAL, :
and JOHN LACEY, individually   :        Civil Action No.
and jointly on behalf of all   :        02-4993 (NLH)
others similarly situated      :
                                     :
            Plaintiffs,        :
                                     :
      v.                       :        **OPINION**
                                     :
CORRECTIONAL MEDICAL SERVICES, :
INC., LOUIS TRIPOLI, M.D.,      :
WILLIAM ANDRADE, JAMES J. NEAL,:
M.D., JAMES RUMAN, R.N., ROCK   :
WELCH, ABU AHSAN, M.D., GEORGE  :
HAYMAN, and JOHN DOE and JANE   :
ROE 1-10,                      :
                                     :
            Defendants.        :
_____    :

APPEARANCES:
Daniel S. Weinstock, Esq.
Thomas More Marrone, Esq.
FELDMAN, SHEPHERD, WOHLGELERNTER
     & TANNER, ESQS.
20 Brace Road, Suite 112
Cherry Hill, NJ 08034
        and
Laura A. Feldman, Esq.
Rosemary Pinto, Esq.
FELDMAN & PINTO
1604 Locust Street, 2R
Philadelphia, PA 19103
*Attorney for Plaintiffs*

Gary J. Lesneski, Esq.
Kerri E. Chewing, Esq.
ARCHER & GREINER, P.C.
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033-0968
*Attorneys for Defendants Correctional Medical Services, Inc.,*
*William Andrada, James J. Neal, M.D., James Ruman, R.N., Rock*
*Welch, Abu Ashan, M.D.*

Sarah Brie Campbell, Esq.
Dianne M. Moratti, Esq.
OFFICE OF THE NJ ATTORNEY GENERAL
Department of Law & Public Safety
RJ Hughes Justice Complex
P.O. Box 112
Trenton, NJ 08625
*Attorney for Defendant George Hayman, NJDOC Commissioner*

**HILLMAN, District Judge**

### I.   **INTRODUCTION**

Plaintiffs Walter Bennett, Gregory Royal and John Lacey have brought an action individually and jointly on behalf of all persons similarly situated (collectively "Plaintiffs") seeking injunctive, declaratory and monetary relief.  Plaintiffs allege in their Second Amended Complaint that Correctional Medical Services Inc., Louis Tripoli, M.D.,[1] William Andrade, M.D., James J. Neal, M.D., James Ruman, R.N., Rock Welch, Abu Ahsan, M.D., (hereinafter "CMS Defendants"), George Hayman, in his capacity as Commissioner of the New Jersey Department of Corrections ("NJDOC"),[2] John Doe and Jane Roe 1-10 (collectively, "Defendants") knowingly exposed Plaintiffs to the hepatitis C

---

[1]   The parties stipulated to the dismissal of defendant Louis Tripoli, M.D. on July 2, 2007.

[2]   By Order entered on February 7, 2007, George Hayman was substituted for Defendant Devon Brown.  The Court took notice that Devon Brown was named in his official capacity as Commissioner of the New Jersey Department of Corrections (NJDOC), that Devon Brown is no longer the NJDOC Commissioner, and that George Hayman is currently the NJDOC Commissioner.  Plaintiffs' claims against Hayman are limited to a deliberate indifference to medial needs claim and an ADA claim for which they demand injunctive and monetary relief.

virus ("HCV") while Plaintiffs were incarcerated in New Jersey State prisons in deliberate indifference to their serious medical needs in violation of their Eighth and Fourteenth Amendment rights under the U.S. Constitution.  They also brought claims for violation of the Americans with Disabilities Act, 42 U.S.C.A. § 12131, et. seq. ("ADA").[3]

This Opinion addresses the following outstanding motions: Motion to Certify Class (together with Motion for Leave to File an Overlength Brief Nunc Pro Tunc in Opposition to Plaintiffs' Motion for Class Certification); Motion for Partial Summary Judgment as to Plaintiffs' Claim for Injunctive and Declaratory Relief; Motion for Summary Judgment as to Claims by Royal and Lacey, and as to Plaintiffs' ADA Claims (together with Motion to Seal Certain Documents in Support of Motions for Summary Judgment); and Motion for Summary Judgment filed by defendant George Hayman.

## II.  **JURISDICTION**

This Court exercises subject matter jurisdiction over Plaintiffs' federal law claims pursuant to 42 U.S.C. § 1331, and

---

[3] By Order entered on December 21, 2005, Plaintiffs Gregory Royal and John Lacey dismissed their state law claims of negligence, medical malpractice, intentional infliction of emotional distress, and negligent infliction of emotional distress as to defendants Correctional Medical Services Inc., Louis Tripoli, M.D., William Andrade, M.D., James J. Neal, M.D., James Ruman, R.N., Rock Welch, and Abu Ahsan, M.D.  Plaintiff Bennett continues to litigate those claims against the CMS Defendants.

exercises supplemental jurisdiction over Plaintiffs' state law claims pursuant to 42 U.S.C. § 1332.

**III. <u>BACKGROUND</u>**

Plaintiffs filed their Complaint on October 16, 2002.  On July 25, 2003, an Amended Complaint was filed, and on August 27, 2003, a Second Amended Complaint was filed which is the current version.[4]  In their Second Amended Complaint, Plaintiffs allege that Defendants knowingly exposed Plaintiffs to HCV while Plaintiffs were incarcerated in New Jersey State prisons. Plaintiffs are seeking injunctive, declaratory and monetary relief against Defendants due to deliberate indifference of their serious medical needs in violation of their Eighth Amendment right to be free from cruel and unusual punishment, applicable to the states through the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983.  Plaintiffs seek "an injunction requiring defendants to comply with FBOP guidelines, an injunction requiring backscreening of the entire population of inmates who

---

[4]  Several other cases have been filed in this Court by inmates or former inmates of the New Jersey State Prisons alleging similar causes of action as alleged in this matter and have been coordinated with this case for discovery management purposes.  The other cases are: <u>Jose Lopez v. CMS</u>, 04-2155(NLH); <u>Estate of Cornell Thomas v. CMS</u>, 04-3358(NLH); <u>Ricky Nefferdorf v. CMS</u>, 04-3411(NLH); <u>Frank Hubbard v. CMS</u>, 04-3412(SDW); <u>Jason Smart-El v. CMS</u>, 04-3413(NLH); <u>David Wenner v. CMS</u>, 04-3414(NLH); and <u>Estate of Daniel Reynolds v. CMS</u>, 04-3416(RMB).  In 2006, two additional cases were filed: <u>Struble v. Tripoli</u>, 06-1589(NLH), and <u>Amos v. CMS</u>, 06-1892(NLH) which are also coordinated for discovery purposes.

have passed through and/or remain in the New Jersey state prison system, money damages for violation of constitutional rights, and punitive damages." The putative class's theory of recovery under 28 U.S.C. § 1983 is that until 2003, Defendants failed to screen incoming inmates for HCV, and that Defendants have not "backscreened," inmates for HCV, i.e., screened incarcerated inmates not originally screened upon intake. As a result, Plaintiffs argue that inmates who have HCV have had their condition remain undiagnosed and untreated, and have exposed other inmates to the virus.

The parties agree that HCV is a serious medical condition. See Ellis v. Mohenis Services Inc., No. 96-6307, 1998 WL 564478, at *3 n.2 (E.D.Pa. Aug. 24, 1998) (explaining that HCV remains in the blood and accounts for a large percentage of cirrhosis, liver failure and liver cancer cases (citing to Downs v. Hawkeye Health Servies, Inc., No. 97-3851, 1998 WL 348201, at *3 (8th Cir. July 1, 1998) (quoting from Stedman's Medical Dictionary 784 (26th ed. 1995)). HCV is not a disease, but a virus that can cause liver disease, and over time, liver damage. HCV is a blood borne virus that can be spread through IV drug use, sexual contact, needle stick injury, tattooing, body piercing, or any other means of transferring blood.

Plaintiff Walter Bennett was incarcerated in the New Jersey State Prisons from approximately April 15, 1992 until June 5,

2002.  Bennett maintains that he had a prior history of
intravenous drug use and had a blood transfusion in 1992, both of
which are risk factors for HCV.  Bennett asserts that while in
prison, he underwent blood tests that showed elevated levels of
hepatocellular enzymes which should have prompted follow-up blood
work and counseling regarding HCV by Defendants.  Instead,
Bennett argues that he was not tested and diagnosed with HCV
until he underwent routine blood procedures shortly before his
release from prison.  Bennett also complains that Defendants
failed to counsel him or educate him as to the consequences
concerning the virus.  The CMS Defendants' expert, Carroll M.
Leevy, M.D., submitted a report stating that Bennett's medical
records revealed that he had elevated alanine aminotransferase
(ALT) levels in 1995 and in 1996.  Elevated levels of ALT are an
indication of HCV.  Dr. Leevy writes that in November 2001, a
hepatitis panel was ordered for Bennett that confirmed that he
had HCV.  She also writes that on April 29, 2002, Bennett was
seen in the Infectious Disease Clinic and provided education
regarding HCV on May 15, 2002, but was not treated in prison for
HCV.  Upon release on June 5, 2002, Bennett was treated by his
family physician and is currently symptom free.

Plaintiff Gregory Royal was transferred in May 1999 to the
New Jersey State Prison and is currently incarcerated at South
Woods State Prison.  Royal states that in September 2001, he was

advised by a nurse employed by CMS that he had HCV and liver damage.  Royal maintains that he was given an injection but not provided with adequate counseling or treatment for his HCV.  In April 2003, Royal states that he was told he was scheduled for a liver biopsy but as of the date of the Second Amended Complaint, he had not had the operation.  The CMS Defendants' expert, Dr. Leevy, provides in her report that Royal's records show that he had elevated ALT levels in 1999, 2000 and 2001.  On April 11, 2001, a hepatitis panel was ordered and came back positive for hepatitis.  Royal was given a hepatitis A vaccine in June 2001. Her report continues to describe the education and treatment options discussed with Royal by medical practioners.  Dr. Leevy provides that Royal's treatment for his HCV was delayed due to his not being an ideal candidate for HCV therapy and possible side effects.[5]  On February 22, 2006, Royal was started on drug treatment but his success with this treatment has not yet been determined.

Plaintiff John Lacey has been incarcerated in New Jersey state prisons since 1983, and admits he is not infected with HCV.

---

[5] In addition, the CMS Defendants provide the affidavit of Mary Thomas, N.P., a nurse practitioner employed by CMS, dated July 13, 2006.  Nurse Thomas states that she educated Royal about his treatment options for HCV on numerous occasions, and on August 2, 2004, Royal refused to consent to the evaluation and treatment because he wanted to wait for better treatments to become available.

## IV. **DISCUSSION**

This Court cannot exercise jurisdiction over cases that are moot and, therefore, we first address the issue of whether Plaintiffs' request for injunctive and declaratory relief is justiciable if Defendants have adopted current Federal Bureau of Prison ("FBOP") guidelines for the management of HCV, and if all NJDOC inmates have been "back-screened."  For the reasons explained below, Plaintiffs' request for injunctive and declaratory relief is denied as moot.

### A.   **MOOTNESS**

In examining whether this case should be dismissed on grounds of mootness, we must determine whether Plaintiffs had a live controversy when they filed suit, and if so, whether the relief provided by Defendants during the pendency of this litigation rendered the injunctive relief requested moot.[6]

---

[6] In a class action context, special rules regarding mootness apply.  Lusardi v. Xerox Corp., 975 F.2d 964, 974 (3d Cir. 1992).  After the class has been certified, the action does not become moot because the claims of the class representative have become moot.  Id.  This is because "the class acquire[s] a legal status separate from the interest asserted [by its named plaintiff]." Id. (relying on Sosna v. Iowa, 419 U.S. 393, 399 (1975).  Different rules apply if the class has not been certified and the putative class representative's claims are moot.  "Normally, when claims of the named plaintiffs become moot before class certification, dismissal of the action is required." Id. (citing to Kremens v. Bartley, 431 U.S. 119, 132-33 (1977)).  If the plaintiff's claims are not justiciable than there is no "live" case or controversy within the meaning of Article III of the Constitution. Id. (citing to Zeidman v. J. Ray McDermott & Co., Inc., 651 F.2d 1030, 1041 (1981).

Under Article III of the U.S. Constitution, the judicial power of the United States shall extend to "cases" and "controversies." U.S. Const. art. III, § 2.  The "case or controversy" requirement serves to limit the "business of federal courts to 'questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process,' and it defines the 'role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government.'" U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 395-96 (1980)(citing to Flast v. Cohen, 392 U.S. 83, 95 (1968)). This constitutional limitation renders a case moot: "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Id. (citing to Powell v. McCormack, 395 U.S. 486, 496 (1969).  "Article III does not permit federal courts to decide moot cases." Rosetti v. Shalala, 12 F.3d 1216, 1223 (3d Cir. 1993)(relying on Liner v. Jafco, Inc., 375 U.S. 301, 306 n. 3 (1964)).

At the center of the Defendants' argument for mootness is that Plaintiffs have been provided with the requested injunctive relief and, therefore, no further relief need be provided.  It is not enough, however, for Defendants to simply cease the alleged illegal conduct to circumvent an injunction being imposed.  "Mere voluntary cessation of allegedly illegal conduct does not moot a

case; if it did, the courts would be compelled to leave '[t]he

defendant ... free to return to his old ways.'" Hilton v. Wright,

235 F.R.D. 40, 47 (N.D.N.Y. 2006)(citing United States v.

Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203 (1968)

(quoting United States v. W.T. Grant Co., 345 U.S. 629, 632

(1953)).

    In addition to the voluntary cessation of the challenged

conduct, a case becomes moot if: "(1) it can be said with

assurance that 'there is no reasonable expectation ...' that the

alleged violation will recur, ... and (2) interim relief or

events have completely and irrevocably eradicated the effects of

the alleged violation." Phillips v. Pennsylvania Higher

Education Assistance Agency, 657 F.2d 554, 569 (3d Cir. 1981),

cert. denied by 455 U.S. 924 (1982)(quoting Marshall v. Whittaker

Corp., Berwick Forge & Fabricating Co., 610 F.2d 1141, 1145 n.9

(3d Cir. 1979); County of Los Angeles v. Davis, 440 U.S. 625, 631

(1979)). "The 'heavy burden of persua[ding]' the court that the

challenged conduct cannot reasonably be expected to start up

again lies with the party asserting mootness." Public Interest

Research Group of New Jersey, Inc. v. Hercules, Inc., No. 89-

2291, 93-2381, 2003 WL 23519620, at *11 (D.N.J. Oct. 27,

2003)(quoting Friends of the Earth, Inc. v. Laidlaw Environmental

Services (TOC), Inc., 528 U.S. 167, 190 (2000)).

    Under the test for mootness, Defendants have the heavy

burden of proving that: (1) there is no reasonable expectation
that the alleged violations of failing to screen inmates for HCV
will recur; and (2) the Defendants' policy for screening new
inmates and "backscreening" current inmates has completely and
irrevocably eradicated the effects of the alleged violation.  We
find that Defendants have shouldered this heavy burden.[7]

Defendants have provided evidence that "an extensive HCV
program regarding the education, screening, testing, diagnosis
and treatment of New Jersey prisoners that follows the FBOP's
Guidelines."  In support of their argument, the CMS Defendants
submitted the Affidavit of the New Jersey Medical Director for
CMS, Lionel Anicette, Jr., M.D.,[8] who states that injunctive
relief requested by Plaintiffs is not necessary because a

---

[7] In addition to mootness, Defendants argue that summary
judgment should be granted as to Plaintiffs' request for
injunctive and declaratory relief because: Plaintiffs lack
standing; Plaintiffs are not entitled to injunctive and
declaratory relief because they cannot prove that the CMS
defendants were deliberately indifferent to their medical needs;
and, this Court lacks jurisdiction to enforce compliance with
injunctive relief under the Prison Litigation Reform Act ("PLRA")
because the relief requested by Plaintiffs does not conform to
the standard set forth under 18 U.S.C. § 3626(a)(1)(A), and
because this Court cannot exercise jurisdiction over the New
Jersey prisons if they are following current FBOP Guidelines. We
do not reach the merits of these alternative arguments for
summary judgment because we decide that Plaintiffs' request for
injunctive and declaratory relief is moot and should be dismissed
on that ground.

[8] Dr. Anicette's Affidavit was submitted under seal because
it includes exhibits containing confidential documents.  The
statements quoted above appear in the Affidavit and were not
taken from the exhibits.

comprehensive HCV program has been adopted and implemented, and is being monitored to assure that the inmates receive HCV treatment consistent with the standards set forth in the FBOP Guidelines for the prevention and treatment of viral hepatitis, including HCV.  Dr. Anicette further states in his Affidavit that "backscreening" of the New Jersey State inmate population "has been completed."

More specifically, the Anicette Affidavit provides a list of the following actions taken with regard to their screening policy:

> The New Jersey Department of Corrections (NJDOC) has directed that the FBOP's HCV Guidelines should be followed and this directive has been communicated to all healthcare providers.
>
> a.   CMS has subcontracted with the Cooper Health System and its Infectious Disease Department to provide infectious disease consultations to inmates.  Cooper Hospital is also in the process of reviewing every HCV inmate's medical care to assure compliance with the FBOP's HCV Guidelines.
>
> b.   All inmates who meet the treatment criteria in the FBOP's HCV Guidelines are offered HCV pharmacologic treatment which they can accept or reject. Inmates who accept HCV medications are given a combination of pegylated interferon in combination with ribavirin.  This pharmacologic treatment is FDA approved and recommended for use in the FBOP's HCV guidelines.
>
> c.   Inmates in New Jersey, including in excess of 7,000 admitted prior to

February 1, 2003, have been given a
Blood Borne Pathogen Risk Assessment
("BBPRA")(HCV/HIV).  HCV is a blood
borne pathogen.  Inmates who were
identified with a positive risk factor
for HCV have been encouraged to consent
to a HCV test.

d.   Any inmate who requests an HCV test is
given the test.

e.   All inmates are given extensive
counseling and education materials, a
NJDOC video on HCV and direct
communications with their healthcare
providers.[9]

f.   The inmates' Electronic Medical Records
("EMRs") have been updated with
comprehensive HCV forms to assure more
consistent and thorough HCV
documentation.

g.   The care and treatment of all HCV
inmates is closely tracked.

h.   CMS compiles and analyzes statistical
data regarding New Jersey's HCV program
to measure and analyze the effectiveness
of the program.  The data is shared with
the NJDOC.

i.   The NJDOC monitors the HCV care and
treatment given to inmates and CMS is
subject to contractual penalties if it
does not comply with its contract.

Anicette Affidavit ¶6.

Defendant Hayman also argues that NJDOC requires that CMS

follow FBOP guidelines for HCV detection and treatment, and in

_____

[9] Defendant Hayman has stated that in June 2007, it
incorporated a new training video entitled "Hepatitis C - What
You Need to Know."

support thereof attached the affidavit of Ralph Woodward,
managing physician employed by NJDOC as director of health care
services, who stated that in January 2003, the NJDOC and CMS
adopted HCV guidelines based the FBOP guidelines.

Moreover, Plaintiffs admit that adoption of the FBOP
Guidelines would provide appropriate relief. Plaintiffs' expert,
Bennett Downs Cecil, III, M.D., states in his written expert
opinion that,

> at all times subsequent to January of 2003,
> CMS and the New Jersey Department of
> Corrections have adopted the most current
> version of the Federal Bureau of Prison
> Guidelines with respect to the handling of
> new inmates. ... Assuming the Guidelines are
> being followed, appropriate Hepatitis C
> testing is being done with respect to these
> inmates, appropriate biopsies are being
> performed and pharmacologic treatment is
> being offered where indicated.

In addition to Plaintiffs' expert having no criticism of
NJDOC and CMS following the FBOP guidelines, CMS Defendants point
out that Courts in this District have ruled that an appropriate
standard of care for treatment of HCV in New Jersey State prisons
is compliant with FBOP guidelines. See Christy v. Robinson, 216
F.Supp.2d 398, 416 (D.N.J. 2002).

Thus, based on the evidence provided, the Court finds that
Defendants are following the FBOB Guidelines with respect to HCV
treatment and are screening new inmates for HCV.  Therefore,
Plaintiffs' request for injunctive relief asking the Court to

intervene to provide a proper screening mechanism for new inmates is denied as moot.

Although they admit that Defendants have adopted the FBOP Guidelines, the Plaintiffs argue that Defendants have not addressed the second prong of the mootness test because they "have not carried their burden to establish that there is no reasonable probability that the actual and threatened injuries Plaintiffs complained of at the beginning of the litigation have been completely and adequately resolved."  Specifically, in their request for injunctive relief they ask that the Defendants "backscreen" the current inmates in the New Jersey prisons.  They argue that even if Defendants adopt a policy of screening new inmates for HCV, the current inmate population was not adequately screened and, therefore, inmates that are unaware that they are HCV positive exist in the prison population.  These potentially undiagnosed inmates are not receiving treatment, education or counseling, and can expose uninfected inmates to the virus.  Plaintiffs' expert, Dr. Cecil, opines that if an undiagnosed HCV inmate exists among the prison population, then any HCV policy would fail because the HCV negative inmate population is at risk of becoming infected.

Defendants do not dispute this argument but rather maintain that the current New Jersey prison population has been "backscreened."  In their July 28, 2006 brief, they maintain that

15

CMS "recently undertook a substantial project to make certain that this was done and documented in the EMR [Electronic Medical Records]." Their efforts are documented as follows:

> The "backscreening" effort started in December 2005 and was completed in May 2006. Except for the inmates who were already diagnosed as HCV positive, those who were already tested for HCV, or those who refused to answer screening questions, all inmates admitted prior to February 1, 2003, more than 7,000 inmates, were offered a new risk assessment for HCV. The risk assessment is documented in the inmates' EMRs.

In support of their argument, the CMS Defendants provide the affidavit of Dr. Anicette who described the efforts undertaken during the December 2005 - May 2006 backscreening project.[10] Dr. Anicette states that all inmates admitted prior to February 1, 2003, were offered a new risk assessment that was documented in their EMRs, and those that had positive risk factors were encouraged to take the test for HCV.

CMS Defendants also provide the affidavit of Inna Vaynberg, P.A., a physician's assistant employed by CMS. In her affidavit, she describes a process conducted in late 2005 in which she met with inmates and completed a Blood Borne Pathogen Risk Assessment ("BBPRA") and documented the assessment in the inmates' Electronic Medical Record ("EMR"). The purpose of her meeting with the inmates was to assess their HCV risk factors. Attached

---

[10] The CMS Defendants and Dr. Anicette maintain that all inmates were assessed and educated for HCV factors before the backscreening project but took "extra efforts to make sure that this was documented in the EMR."

to her affidavit as exhibits were copies of the BBPRA form used in the EMR, as well as a form she used for discussion purposes with each inmate to ascertain their risk for HCV.  Finally, Defendant Hayman supplied the affidavit of Ralph Woodward, NJDOC director of health care services, who confirmed that the "back-screening" process of all NJDOC inmates was completed in May 2006.

Plaintiffs do not deny that backscreening was completed in May 2006.  Instead, Plaintiffs rely on the deposition testimony of Victor Wijesinghe, the statewide director of CMS's HCV program, to rebut Dr. Anicette.  Plaintiffs maintain that Mr. Wijesinghe testified that "Defendants did not collect data and in fact did not want to know even the true prevalence rate of HCV in the prisons."[11]  Mr. Wijesinghe's deposition was taken on April

---

[11]    Plaintiffs make much of the fact that Defendants do not know the true prevalence rate of HCV among the inmates which they describe as "key" to any HCV treatment policy.  Defendants admit they do not know this information.  They argue that knowing the true prevalence of HCV in the prisons would require mandatory testing of the blood of every inmate which is illegal under N.J.A.C. 10A:16-5.1.  N.J.A.C. 10A:16-5.1(a) provides that "the express written consent of the inmate shall be required for:...(2) invasive procedures;... ."  The CMS Defendants did not cite any case law interpreting that statute.  A search performed by the Court resulted in one case, John Karolis v. New Jersey Dept. of Corrections, 935 F. Supp. 523, 525 (D.N.J. 1996), that cited to N.J.A.C. 10A:16-5.1 with regard to testing inmates for tuberculosis.  The Karolis case did not interpret the statute but did hold that the state's compelling interest in preventing the spread of tuberculosis in its prisons outweighed the inmates right to free exercise of religion under the Religious Freedom Restoration Act and the First Amendment.  Id. at 530-31.

8, 2004.  The CMS Defendants state that the backscreening project
described above was started in December 2005 and completed in May
2006.  The project was started and completed after Mr.
Wijesinghe's deposition and after Plaintiff's expert submitted
his report.  In addition, Defendant Hayman submitted the
affidavit of Diane M. Moratti stating that during a hearing held
on May 18, 2007, counsel for Plaintiffs confirmed that "back-
screening" for HCV risk factors for all inmates had been
completed.  Thus, there is no need for the Court to order
Defendants to "backscreen" all current New Jersey prison inmates
as this process has been completed.

Nonetheless, Plaintiffs argue that even if Defendants
adopted the FBOP Guidelines for HCV treatment and backscreened
all existing inmates, a reasonable expectation exists that
Defendants will resume their alleged liable conduct if this Court
does not intervene and provide injunctive relief.  Plaintiffs
point out that Defendants only began screening inmates after they
filed suit.  Plaintiffs state that "because the CMS Defendants
only began following FBOP Guidelines after this litigation began
in response to substantial adverse publicity, there is a genuine

_____

Plaintiffs did not provide any argument in opposition to the CMS
Defendants' claim that mandatory testing of inmates for HCV
contravenes N.J.A.C. 10A:16-5.1.  Since Plaintiffs make no demand
for mandatory, involuntary blood-testing of inmates to detect
HCV, that precise issue is not before us and we make no finding
on whether such a policy would contravene N.J.A.C. 10A:16-5.1.

issue of material fact whether Defendants will continue [sic] act responsibly without litigation or Court supervision."

The record shows that Defendants adopted a formal screening policy on February 1, 2003, which is after the first complaint was filed on October 16, 2002.  In addition, the CMS Defendants admitted that the "backscreening" project was not started until December 2005 and completed five months later.  The timing of these two events, after litigation was filed, prompts the Court to take a closer look at the Defendants' conduct and scrutinize their actions in order to determine whether it is likely that the current HCV policy is a permanent change, or whether Defendants are likely to revert back their old ways.  See Hilton, 235 F.R.D. at 47 (stating that "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'")(citations omitted).

Based upon the evidence provided to the Court concerning the Defendants' compliance with the FBOP guidelines for the screening, treatment and education of new inmates into the New Jersey Prison system, and the evidence concerning the December 2005 - May 2006 "backscreening project," we find that Defendants have satisfied the test for mootness.  There is no reasonable expectation that the alleged violations of failing to screen new inmates for HCV will recur.  Defendants have provided evidence

19

showing that a formal written policy has been adopted, is being followed, and that there are safeguards in the policy to ensure its future compliance.  The policy requires tracking of inmates to provide statistical information regarding HCV, and cooperation with local health care providers for treatment of HCV positive inmates.

Thus, if all current New Jersey State prison inmates have had their risk for HCV assessed, i.e., screened, and, the prisons are following the FBOP Guidelines for HCV treatment, then there is no further injunctive relief that the Court could order that has not already been provided by the Defendants.  "...[I]f a favorable decision by a federal court could not provide the plaintiffs with more than the defendant has already given them, the entire case, including the question of class certification, would be moot." Rosetti v. Shalala, 12 F.3d 1216, 1232 (3d Cir. 1993)(citing to California v. San Pablo & Tulare R.R., 149 U.S. 308, (1893)).  Therefore, we deny Plaintiffs' request for injunctive and declaratory relief as moot.

In addition to mootness, Defendants also raise another defense of non-justiciability with regard to plaintiff Lacey - standing.  For the reasons explained below, Lacey is dismissed individually and as the representative of the putative members of subclass one for lack of standing.

**B.    STANDING**

On May 15, 2006, Plaintiffs filed a motion for class certification.  Plaintiffs' putative class would consist of all New Jersey State prison inmates from January 1990 until the present, divided into two subclasses: (1) all individuals who are or were incarcerated in New Jersey State prisons from January 1990 to the present and who *are not infected* with HCV; and (2) all individuals who are or were incarcerated in New Jersey State prisons from January 1990 to the present and who *are infected* with HCV.  Even though subclass one does not have an injury, Plaintiffs argue that they have standing because they were exposed to the threat of injury traceable to Defendants.

Normally, lack of standing strips this Court of jurisdiction.  See Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003)(quoting that "a federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." Preiser v. Newkirk, 422 U.S. 395, 401 (1975)).  Standing raises other considerations, however, in a class action context.  In the companion cases Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997) and Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999), the Supreme Court decided that "... a Rule 23 question should be treated first because class certification issues are "logically antecedent" to Article III concerns...and pertain to statutory

standing, which may properly be treated before Article III standing... ."  After Amchem and Ortiz, Federal courts faced with challenges to standing in class certification cases must assess whether certifying the class gives rise to the standing issue. See Clark v. McDonald's Corp., 213 F.R.D. 198, 204 (D.N.J. 2003) (deciding the class certification issues first because they were "logically antecedent" to those of standing).

Here, we do not address the class certification first because the putative class representative for subclass one, Lacey, lacks standing.  In cases where the putative class representative lacks standing, the Article III standing issue is decided first.  See id. (finding that "Ortiz exception treating class certification as the antecedent consideration does not apply if the standing issue would exist regardless of whether the named plaintiff filed his claim alone or as part of a class."); see also, Stone v. Crispers Restaurants, Inc., No. 06-cv-1086, 2006 WL 2850103, at *2 (M.D. Fla. Oct. 3, 2006)(concluding that class certification not be addressed because the putative class representative himself lacked standing).

"At the core of the standing doctrine is the requirement that a plaintiff 'allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" County of Riverside v. McLaughlin, 500 U.S. 44, 51 (1991)(citing Allen v. Wright, 468 U.S. 737, 751

(1984) which cited to Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982)).  If the plaintiff lacks standing to bring his individual claims, he also lacks standing to assert claims on behalf of a class. Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 135 (3d Cir. 2000)(stating that "... a plaintiff who lacks the personalized, redressable injury required for standing to assert claims on his own behalf would also lack standing to assert similar claims on behalf of a class.").

In support of their argument that Lacey has standing, Plaintiffs cite to United Food & Comm'l Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 551 (1996)(finding Union had standing to bring action under the Worker Adjustment and Retraining Notification Act on behalf of its members).  The question before the Court in United Food was whether a union has standing to bring an action on behalf of its members, i.e., whether it has "associational standing," and did not address whether standing can be conferred if the plaintiff suffered only a threat of an injury.  Likewise, Plaintiffs' reference to Borough of Carlstadt v. U.S. Army Corps of Eng'rs, focuses on "prudential standing" and does not support their position on standing. No. 05-2771, 2006 WL 30514, at *4, n.4 (D.N.J. Feb. 8, 2006)(finding that Plaintiff *failed* to establish that it had "prudential standing" to maintain its causes of action alleging

23

violations of federal statutes).

Here, we are not faced with issues of associational standing or prudential standing.  Plaintiff John Lacey, who does not have HCV, has filed suit individually and as representative of a class of persons similarly situated.  We must decide whether Lacey has standing to bring a claim pursuant to 42 U.S.C. § 1983 for alleged violations of his Eighth Amendment rights due to the deliberate indifference by Defendants of his serious medical needs.

There is support for the claim that the Eighth Amendment protects against exposure to unreasonable risk of serious damage to the future health of inmates.  Helling v. McKinney, 509 U.S. 25, 33 (1993).  In Helling, the Supreme Court found that a prisoner stated a claim under the Eighth Amendment by alleging that prison officials were deliberately indifferent by exposing him to environmental tobacco smoke ("ETS") that posed "an unreasonable risk of serious damage to his future health."  The prisoner, McKinney, was serving a sentence in the Nevada State Prison and was assigned to a cell with another inmate who smoked five packs of cigarettes a day. Id. at 28.  Scientific evidence was presented to the court that sufficient exposure to ETS could endanger one's health. Id. at 29.  In addition, the lower court "concluded that society's attitude had evolved to the point that involuntary exposure to unreasonably dangerous levels of ETS

24

violated current standards of decency." Id.

The Court found that McKinney stated a cause of action under the Eighth Amendment by alleging that the Nevada State prison exposed McKinney with deliberate indifference to levels of ETS that presented an unreasonable risk of serious damage to his future health. Id. at 34. The Supreme Court acknowledged that the Courts of Appeals have recognized that inmates are protected under the Eighth Amendment against imminent dangers that pose a significant risk of proximate and substantial harm. Id. at 34. The Court remanded the case back to the lower court with instructions that McKinney prove both the objective and subjective elements necessary to sustain an Eighth Amendment violation: that he was directly exposed to unreasonably high levels of ETS; that society considers the risk he complains of to be so grave that "it violates contemporary standards of decency;" and that prison officials were deliberately indifferent. Id.

We find material differences between Helling and the case before us. In Helling, the inmate was subjected directly and involuntarily to high levels of ETS on a daily basis. Id. (stating that "[w]ith respect to the objective factor, McKinney must show that *he himself* is being exposed to unreasonably high levels of ETS.")(emphasis added). Lacey argues that inmates entered the New Jersey Prisons who were unscreened for HCV, and uneducated about prevention and treatment of the virus. He

maintains that this situation resulted in non-HCV inmates being exposed to HCV inmates.  The difficulty, however, is that we do not know if Lacey was ever actually involuntarily directly exposed to the virus.  The virus is spread through blood contact. It is unlike tuberculosis or ETS which is transmitted through the air.  To be directly exposed to HCV, there must be direct contact with an infected person, such as sexual intercourse, use of an infected needle that pierces the skin, or other means of transferring blood.  Although Lacey provides that such activities occur in the prisons and that Defendants are aware that they occur,[12] he has not alleged that he personally was involuntarily directly exposed to HCV.  At best, he has alleged that he has been in close proximity with individuals who have HCV creating a possibility of being directly exposed to HCV.

Applying the objective factor test in Helling, we must determine whether being in close quarters with individuals who may have HCV is a risk society views as so grave that "it violates contemporary standards of decency."  Lacey has provided no evidence as to society's current standard of decency as to HCV.  In everyday life, society certainly encounters people on the train, in restaurants, health clubs, and hotels that are HCV

---

[12] In his deposition, Dr. Anicette testified that he is aware that prisoners engage in sexual relations, take intravenous drugs, share tattoo needles, share razors and share toothbrushes while in prison and have engaged in these activities since at least the early 1990's.

26

positive.  No evidence has been presented to the Court that HCV screening is required to enter any of those places.  This is not to say that we make any findings as to society's contemporary standards of decency with respect to HCV screening, education or treatment.  Rather, we are providing examples to show the type of evidence that is missing from the record in order for the Court to make a determination based upon objective evidence.  It is Plaintiffs' burden to provide this evidence and they have not done so.[13]

Finally, <u>Helling</u> requires that a plaintiff provide subjective evidence so that the Court can determine if a defendant was deliberately indifferent in light of the "prison authorities' *current* attitudes and conduct." <u>Id.</u> (emphasis added).  The Supreme Court noted that the smoking policy, adopted by the prison after McKinney filed suit, would bear heavily on the inquiry into deliberate indifference.  Thus, Plaintiff Lacey's allegation that Defendants were deliberately indifferent to his serious medical needs relate to conduct before a formal policy was adopted and screening project completed.  Plaintiff

---

[13] We acknowledge the evidence presented indicating that the prison population has a much higher incidence of HCV than the general population.  This evidence suggests that some action on the part of prison officials is appropriate.  However, as the Court concluded in the previous section, the action requested by Plaintiffs – for Defendants to follow the FBOP Guidelines for the treatment of HCV and to screen all inmates – has been provided by Defendants.

Lacey has not shown that he has an "injury" because he has not presented any evidence that he was directly exposed to HCV, that Defendants' conduct violated contemporary standards of decency, or evidence of deliberate indifference in light of the "prison authorities' current attitudes and conduct."

Even if Lacey were able to show direct, involuntary exposure, he cannot show that there is an unreasonable risk to his *future* health. Lacey admits that he does not have HCV. By admitting he does not have HCV, Lacey has foreclosed the risk to his future health for contracting the virus due to Defendants' alleged conduct.[14] Exposure by itself does not present a viable claim of an injury. The exposure must be direct and involuntary, be in violation of contemporary standards of decency, be from deliberate indifference of the prison officials and present an unreasonable risk to future health. See Helling, 509 U.S. at 33. Lacey has not met these requirements and, therefore, lacks

_____

[14] We note in Helling, that the court discussed other cases in which it found an unreasonable risk to future health. Specifically, the court relied on a decision that found inmates crowded into cells with other inmates suffering from infectious maladies such as hepatitis and venereal disease stated a claim under the Eighth Amendment "... even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed." Id. at 33, quoting Hutto v. Finney, 437 U.S. 678, 682 (1978). Although the Hutto case mentioned "hepatitis" as a disease, the type or level of contagiousness is unknown and it was mentioned as part of prison conditions where inmates were put in "punitive isolation" and "crowded into cells." These conditions are not alleged in this case.

standing to bring his claims on behalf of himself and the putative class members in subclass one.  Therefore, Lacey's claims are dismissed from this action.

Conversely, Bennett and Royal are alleged to suffer a cognizable injury.  They request to serve as class representatives of former and current inmates who have HCV for damages pursuant to 42 U.S.C. § 1983 for deliberate indifference to their serious medical needs in violation of the Eighth Amendment.

### C.   MOTION FOR CLASS CERTIFICATION

Federal Rule of Civil Procedure 23 governs the certification of class actions.  A party seeking class certification bears the burden of proving that each of the requirements under Rule 23 has been met. See, e.g., Baby Neal v. Casey, 43 F.3d 48, 55(3d Cir. 1994).  The legal requisites for class certification are: (1) under Rule 23(a), to satisfy all four requisites of numerosity, commonality, typicality, and appropriateness of class relief; (2) to fulfill at least one part of Rule 23(b); and (3) provide the Court with adequate information so that it can enter an Order defining the class and listing the claims, issues, or defenses subject to class treatment pursuant to Rule 23(c)(1)(B). Id.; Watchel v. Guardian Life Ins. Co., 453 F.3d 179, 184 (3d Cir. 2005).

29

**Rule 23(a)**

Under Rule 23(a), one or more of the Plaintiffs may sue on behalf of all the members of the proposed class only if: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Baby Neal, 43 F.3d at 55.

(1) Numerosity

Plaintiffs state that according to the NJDOC Report on Offender Statistics, in 2005 the number of inmates was 26,239. Since Plaintiffs seek certification of a class of all present and former New Jersey State inmates from 1990 to the present, with or without HCV, they argue that the number of inmates for 2005 alone satisfies the numerosity requirement. The CMS Defendants estimate that the size of the original proposed class is between 400,000 to 500,000 individuals.[15]

These numbers or estimates, however, do not distinguish between inmates with HCV and inmates without HCV. Since subclass

---

[15] The CMS Defendants admit that Plaintiffs meet the numerosity requirement of the original proposed class (including those former and current inmates without HCV). They criticize the size of the class, however, as over broad and imprecise. This argument goes to the requirements under Rule 23(c)(1)(B) which we address in the following section.

one - those who do not have HCV and have not alleged a cognizable
injury - have been found to lack standing, the numerosity
requirement must be satisfied from proposed subclass two -
current or former inmates with HCV.  Given the large size of the
original proposed class, it is possible that Plaintiffs could
meet the numerosity requirement for proposed subclass two.
However, there is not enough information presently before the
Court to make a clear determination.  In order to satisfy the
numerosity requirement, Plaintiffs must provide the Court with at
least an estimated number of proposed subclass two members with
HCV.[16]  Plaintiffs have not provided the Court with an estimate
of class members made up of current or former inmates with HCV
and, therefore, do not meet the numerosity requirement of
23(a)(1).

    (2) Commonality

    The commonality prong of Rule 23(a) requires "questions of
law or fact common to the class."  Fed.R.Civ.P. 23(a)(2).  This
requirement is met if Plaintiffs share "at least one question of
fact or law with the grievances of the prospective class."  Baby
Neal, 43 F.3d at 56.  This commonality requirement has been
recognized as one that is easily met.  Id.  Also, class members

---

    [16] If this were the only defect in Plaintiffs' motion for
class certification, we would deny it without prejudice to allow
Plaintiffs to submit an estimate.  However, Subclass Two does not
qualify for class certification on other grounds.

can assert such a single common complaint if they demonstrate
that all class members are subject to the same harm. Id. (citing
to Hassine v. Jeffes, 846 F.2d 169, 177-78 (3d Cir. 1988).  The
commonality prerequisite does not require that all members of the
prospective class share identical claims.  Hassine, 846 F.2d at
176-77 (relying on Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d
Cir. 1985).  It requires only that the harm complained of be
common to the class, not that Plaintiffs are affected by the harm
in the same way. Id. at 177; Baby Neal, 43 F.3d at 56 (rejecting
the argument that the commonality requirement cannot be met
because of individualized circumstances); Hassine, 846 F.2d at
178 (holding that plaintiffs' allegation that they were subject
to same conditions in prison even if they had not at the time of
the assertion been injured by those conditions met the
commonality requirements).

The CMS Defendants argue that the Plaintiffs do not share
commonality with the prospective class.  They note that Bennett
is no longer incarcerated and his "HCV has essentially been
cured," and that Royal's state law claims have been dismissed.
They further note that "this Court will not be able to make a
determination on the purported 'common' question of plaintiffs'
claims under the Eighth Amendment without an individual review of
the care provided to every class member."  Plaintiffs counter
that they have the same claims for deliberate indifference under

the Eighth Amendment as other class members.

Whether there is a claim common to the putative class is a close question.  A factual issue common to all Plaintiffs is Defendants' alleged policy of not screening all inmates for HCV prior to 2003.  Pitted against this common legal claim, however, are underlying facts that are particular to each plaintiff such as, whether and when a particular inmate was screened, whether he received counseling and education regarding HCV, whether he was directly exposed to the virus, whether he was tested for HCV, and, whether he was provided with proper treatment.

Although we have concerns about the individual claims underlying Plaintiffs' claim, the commonality requirement is not difficult to meet, and Plaintiffs have done so.  In bringing their 42 U.S.C. § 1983 claims, they have alleged that they were subject to the same policy by Defendants of not screening all inmates prior to 2003 which satisfies the requirement that Plaintiffs share "at least one question of fact or law with the grievances of the prospective class."  Baby Neal, 43 F.3d at 56.

(3) Typicality

It has been recognized that the requirements for commonality and typicality are broadly defined and tend to merge.  See Baby Neal, 43 F.3d at 56.  Nevertheless, they are distinct requirements and we scrutinize them individually.  "The typicality inquiry is intended to assess whether the action can

be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." Id.  "Commentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." Id.  Factual differences do not defeat typicality if "... the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." Baby Neal, 43 F.3d at 58.

The typicality requirement is often satisfied where plaintiffs request injunctive or declaratory relief.  Here, the Plaintiffs requested such relief, but their request became moot. Nonetheless, Plaintiffs present at least one common claim – Defendants' failure to screen all inmates prior to 2003 – and the Plaintiffs' claims are typical of the class in that respect.  As with the commonality requirement, Bennett and Royal's claims are typical only with respect to the limited question of Defendants' screening policy and does not extend to any treatment of inmates for HCV.

  (4) Adequacy of Representation

The final prerequisite under Rule 23(a) is a determination

34

whether "the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." <u>Hassine</u>, 846 F.2d 169 at 179 (citations omitted).

There is no challenge by Defendants as to the adequacy of Plaintiffs' counsel and we find none here.  Although there are considerations concerning Bennett's and Lacey's individual treatment of HCV, they can represent the claims of the class with respect to Defendants' alleged policy of failure to screen all inmates for HCV.  Again, the adequacy of representation is limited to the screening policy and does not touch upon individualized treatment of HCV for the inmates.

Thus, Plaintiffs do not meet the requirements under Rule 23(a)(1)-numerosity because they have not provided an estimate of the number of current or former inmates who have HCV.  Although Plaintiffs meet the requirements under the liberal standards of Rule 23(a)(2)-commonality and 23(a)(3)-typicality, the questions common and typical to the class only concern the limited issue of the Defendants' HCV screening policy.[17]  Finally, Plaintiffs meet the adequacy of representation requirement under Rule 23(a)(4).

---

[17] As explained below under Rule 23(b)(3), the individual claims of the Plaintiffs' HCV treatment dominate over their common claim regarding Defendants' screening policy.

### Rule 23(b)

Finding that Plaintiffs have not met the requirements under 23(a)(1), the Court need not go through the requirements under 23(b) and 23(c).  We do so here because even if Plaintiffs were able to provide an estimate of the proposed class, they do not meet the requirements under any of the three subsections of Rule 23(b) and have not provided adequate information to satisfy Rule 23(c).

### Rule 23(b)(1)

Rule 23(b)(1)(A) asks whether prosecution of separate actions would create a risk of inconsistent or varying adjudications with respect to individual members of the putative class resulting in incompatible standards of conduct for the party opposing the class.  Rule 23(b)(1)(B) looks to whether prosecution of separate actions would create a risk of adjudications that would be dispositive of interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.  See In re Orthopedic Bone Screw Products Liability, No. 93-7074, 1995 WL 273597, at *7 (E.D.Pa. Feb. 22, 1995)(stating that Rule 23(b)(1)(B) class actions are commonly referred to as "limited fund" cases on the theory that a limited fund is available to satisfy the claims of putative plaintiffs and that subsequent plaintiffs would be left without a remedy if plaintiffs who sue

36

first could deplete the fund).

Plaintiffs appear to argue that they satisfy both subsections under Rule 23(b)(1). They suggest that litigating Defendants' HCV policy "thousands of times" runs the risk of inconsistent adjudications. We disagree. Adjudication of Plaintiffs' deliberate indifference claims concerning their HCV treatment would not result in inconsistent adjudications as to other putative members of the class. The underlying facts in each plaintiff's § 1983 claim would be particularized to him and would require a determination of each inmate's medical condition and treatment. "The fact that some plaintiffs may be successful in their suits against a defendant while others may not is clearly not a ground for invoking Rule 23(b)(1)(A)." Paulley v. Chandler, No. 99-P549, 2000 WL 33975579, at *3 (W.D. KY. April 18, 2000)(quoting In re Benedectin Prods. Liability Litig., 749 F.2d 300, 305 (6th Cir. 1984))(omitting citations). Likewise, under Rule 23(b)(1)(B), there is no evidence that a ruling on Plaintiffs' claims would substantially impair or impeded subsequent plaintiffs. See id. Also, plaintiffs have not provided "substantive evidence" that Defendants' assets would be insufficient to meet Plaintiffs' claims. See In re Orthopedic Bone Screw Products Liability, 1995 WL 273597, at *7 (citing In Re School Asbestos Litigation, 789 F.2d 996, 999 (3d Cir. 1986)).

<u>Rule 23(b)(2)</u>

Rule 23(b)(2) inquires whether "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Class actions certified under this Rule are limited to cases in which the plaintiff seeks injunctive or declaratory relief.  <u>Reap v. Continental Casualty Co.</u>, 199 F.R.D. 536, 547 (D. N.J. 2001).  Plaintiffs understandably argued that they met this requirement because they had sought injunctive and declaratory relief from the Court.  As we have explained above, such request for relief has been made moot.  Plaintiffs do not offer any other grounds to met this requirement and we find none.

<u>Rule 23(b)(3)</u>

Under Rule 23(b)(3), the Court must determine whether questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is the superior method of adjudication. Plaintiffs maintain that the claims of the class members are identical since they are seeking compensatory damages for constitutional violations, punitive damages and injunctive relief all arising from Defendants' common HCV policies and practices in New Jersey State prisons.  Defendants counter that individual rather than common issues predominate.  Defendants argue that the

38

claims of the individual members will depend upon their unique
medical history and risk factors for HCV, their knowledge of HCV,
and treatment with their doctor, as well as the timing of when
these events took place.

This inquiry is not unlike the inquiry we undertook to
assess the commonality requirement under Rule 23(a).  The focus,
however is a bit different.  Under Rule 23(b)(3), common
questions must *predominate* over any questions affecting
individual members.  Reap v. Continental Casualty Co., 199 F.R.D.
536, 548 (D.N.J. 2001).  Also, treating the Plaintiffs as a class
must be the superior method to adjudicating the controversy.  Id.
The reasoning behind the predominance and superiority
requirements is so that certifying a class "would achieve
economies of time, effort, and expense, and promote ...
uniformity of decision as to persons similarly situated, without
sacrificing procedural fairness or bringing about other
undesirable results." Id.

Here, the common thread identified was Defendants' policy of
failing to screen all inmates for HCV prior to 2003.  Although
that is a common issue of fact that satisfies the commonality
requirement, it does not predominate over the individual claims.
Plaintiffs' claims regarding Defendants' alleged failure to have
all inmates screened for HCV has been rendered moot.  Their 42
U.S.C. § 1983 claims predominate and those claims involve an

inquiry into whether Defendants were deliberately indifferent to their serious medical needs.  To go forward with Plaintiffs' § 1983 claims, we must determine if and when an inmate was screened, if he was directly exposed to HCV while in prison, what treatment options were offered to him and, if applicable, the extent of his treatment.  These individualized questions leave us with the impression that certifying a class would not be the superior method for fair and efficient adjudication of this case.  See Baby Neal, 43 F.3d at 55 (finding that class treatment "makes no sense if there are no common issues; the trial court would gain nothing but logistical headaches from the combination of the cases for trial."); Reap, 199 F.R.D. at 548 (finding that even if shared common questions of fact or law existed, "the additional individualized inquiries that would have to be undertaken on the issue of damages make clear that individual issues predominate over any common ones.").

Thus, Plaintiffs do not meet the requirements under any of the three subsections under Rule 23(b) for class certification.

### Rule 23(c)(1)(B)

Even if Plaintiffs had satisfied the requirements under Rule 23(a) and 23(b), before an Order certifying a proposed class can be entered, there must be adequate information provided to the Court to satisfy the criteria under Rule 23(c)(1)(B).  A plaintiff would need to define the class claims, issues, and

defenses.  This requirement was highlighted by the Third Circuit in Watchel v. Guardian Life Ins. Co., 453 F.3d 179, 184 (3d Cir. 2005).  In Watchel, the court held that pursuant to Rule 23(c)(1)(B) "... the text of the [certification] order or an incorporated opinion must include (1) a readily discernable, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernable, clear, and complete list of the claims, issues or defenses to be treated on a class basis." Id. at 187-88.  Also, the Third Circuit approved the practice whereby plaintiffs submit a pre-certification "trial plan" to the district courts with this information. Id. at 186.

Here, Plaintiffs did not provide any discussion as to Rule 23(c)(1)(B).  The most that Plaintiffs provide is that all of Plaintiffs' claims "... arise from defendants' common policies and practices regarding HCV in the prisons of New Jersey."  This statement is too general.  See id. at 189 (finding that plaintiffs' characterization of the common claim failed to articulate the particular claims asserted by plaintiffs).  It also does not contemplate the fact that the "common policy" of Defendants' failure to screen all inmates has been redressed through Defendants' adoption of the FBOP Guidelines and backscreening project.

Thus, for the reasons explained above, Plaintiffs do not

41

meet the requirements for class certification and their motion is denied.

### D.   MOTIONS FOR SUMMARY JUDGMENT[18]

Having determined that Plaintiffs' demand for injunctive relief is moot, that Plaintiff Lacey lacks standing, and that class certification is not appropriate, we address the remaining issues raised by Defendants' motions for summary judgment. Defendant Hayman's motion seeks to dismiss Plaintiffs' deliberate indifference to medical needs claims and ADA claims, and the CMS Defendants seek to dismiss the deliberate indifference claim of Plaintiff Royal and Plaintiffs' ADA claims.[19]

### 1.   Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56©.

---

[18]  In light of the sensitive nature concerning the medical records of certain former and current New Jersey State inmates, CMS Defendants' Motion to Seal Certain Documents in Support of Motions for Summary Judgment is granted.

[19] CMS did not challenge the deliberate indifference claims of Walter Bennett on summary judgment.

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**2. CMS's Motion to Dismiss Gregory Royal's § 1983 Claim**

The CMS Defendants argue that Royal's claims should be dismissed because they were not deliberately indifferent to Royal's serious medical needs. In support of their argument, they provide evidence concerning the diagnosis of Royal's HCV in May 2001, and his subsequent treatment. If the issue in this case was merely whether the Defendants provided proper treatment to Royal concerning his HCV, then evidence as to his treatment would address that issue. Royal, however, raise a wider issue than just treatment. Although not entirely clear, he suggests that Defendants either failed to properly screen him upon entering the prison system, and/or directly exposed him to the HCV virus.

In order to determine whether summary judgment is proper as to Royal, in addition to evidence regarding his treatment, it must be determined: whether Royal was screened for HCV upon entering the prison; if he ranked in a high risk group for HCV, if he was adequately counseled and educated; and during the time that he was in prison, whether he was directly exposed to HCV. Defendants have not provided a response to the above questions. We do not suggest that answering in the negative would prove a claim, only that a dispute over material issues of fact remain precluding summary judgment of Royal's deliberate indifference claims at this time.

3.    **Hayman's Motion to Dismiss Walter Bennett's and Gregory Royals' § 1983 Claim**

Defendant Hayman argues that Bennett's and Royal's § 1983 claims should be dismissed because NJDOC was not deliberately indifferent to the inmates' medical needs.  In support of his argument, he recites the NJDOC's efforts to deal with HCV in the prisons.  Hayman states that the NJDOC attended national conferences addressing infectious diseases, including HCV, and worked with CMS to create an appropriate response.  Hayman also notes that in the 1990's and early 2000's, there was confusion within the scientific community on how to detect and treat HCV and available medical treatment options evolved over time.  It was NJDOC's understanding that as of April 2000 CMS was following the FBOP guidelines for treatment of HCV and since 2001, the NJDOC participated in the Governor's Council on State-wide Hepatitis C matters.  Hayman further states that in May 2003, the NJDOC distributed HCV educational modules to the entire inmate population describing what HCV is, how it is contracted, how it may be prevented and how it may be treated.

The efforts made by NJDOC with CMS to detect and treat HCV in the prison population is evidence that there is no need for this Court to intervene and issue injunctive or declaratory relief.  The general efforts made do not, however, answer what particular efforts were made on behalf of Plaintiffs Royal and

45

Bennett to detect and treat HCV.  The same questions raised by
CMS's motion are raised here: whether they were screened for HCV
upon entering the prison; if they ranked in a high risk group for
HCV, if they were adequately counseled and educated; and during
their time in prison, whether they were directly exposed to HCV.

Therefore, Defendants have not shown as a matter of law that
they are entitled to summary judgment as to Plaintiffs' § 1983
claims.

### 4.  Plaintiffs' ADA Claims

Defendants also moved for summary judgment as to Plaintiffs'
claims under the Americans with Disabilities Act ("ADA") 42
U.S.C. §§ 12131, et seq.  Defendants argue that Plaintiffs have
failed to show that they have a "disability" as defined under the
ADA.  Further, even if Plaintiffs did have a disability,
Defendants state that Plaintiffs cannot show that they were
discriminated against by reason of their disability.  Because we
find that Plaintiffs have not presented evidence that they have a
disability under the ADA, we dismiss their ADA claim.

Under Title II of the ADA, a plaintiff must establish that:
"(1) he is a qualified person with a disability; (2) who is
subjected to discrimination by a public entity, or is excluded
from participation in or is denied the benefits of the services,
programs, or activities of such entity; (3) because of his

disability." <u>Washington v. Correctional Medical Services</u>, No.
05-3715, 2006 WL 1210522, at *2 (D.N.J. May 1, 2006).  A
disability is defined under the ADA as "a physical or mental
impairment that substantially limits one or more major life
activities of [an] individual." 42 U.S.C. § 12102©.  In support
of their argument that Plaintiffs failed to present evidence of
discrimination under the ADA, the CMS Defendants cite to law in
other courts for the proposition that Plaintiffs must prove that
their disability substantially limits one or more major life
activities.  <u>See</u> <u>Furnish v. SVI Systems, Inc.</u>, 270 F.3d 445, 450
(7th Cir. 2001); <u>Ellis v. Mohenis Services Inc.</u>, No. 96-6307,
1998 WL 564478, at *3-4 (E.D. Pa. Aug. 24, 1998); <u>Sussle v.
Sirinia Prot. Systems Corp.</u>, 269 F. Supp.2d 285, 307 (S.D.N.Y.
2003); <u>Levinson v. Mucker</u>, 289 F.Supp.2d 848, 854 (W.D. Ky 2003).
Those cases conclude that the plaintiff was unable to show that
Hepatitis C substantially limited one or more of his major life
activities. <u>Id.</u>

The Court finds that the Plaintiffs have failed to allege
that their Hepatitis C has substantially limited a major life
activity.  <u>See</u> <u>Zhai v. Cedar Grove Municipality</u>, 193 Fed. Appx.
253, 255-56 (3d Cir. 2006).  Bennett and Royal, who allege to
have the virus, simply offer to prove that they suffer from the
virus.  They do not identify any major life activity that has
been impaired by having the virus.  Plaintiffs provide no

47

response to Defendants' argument that Plaintiffs' ADA claims should be dismissed on summary judgment.  Therefore, since these plaintiffs have failed to offer proof on an essential element of their ADA claim - namely that they suffer from a disability as defined by the statute - their ADA claims must be dismissed in their entirety as a matter of law.

## V.   **CONCLUSION**

Plaintiffs' motion for class certification is denied.  The Defendants' motions as to Plaintiffs' request for injunctive and declaratory relief are granted on the ground that Plaintiffs' request for such relief is moot.  The Defendants' motions are denied as to the § 1983 claims but granted as to the ADA claims. Defendants' motion to file an overlength brief and motion to seal are granted.

An Order will be entered consistent with this Opinion.


                                    s/Noel L. Hillman
                                    NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey


Dated:   May 14, 2008